DEVEBER KIRKPATRICK and FRANK STENTO, Respondents, Appellants, v. THE CITY OF BINGHAMTON, Appellant, Respondent.

Third Department, January 11, 1939.

*Charles R. Stewart,* for the plaintiff Kirkpatrick.

*Mangan & Mangan* [*Charles R. Stewart* of counsel], for the plaintiff Stento.

*Samuel H. Pearis, Corporation Counsel* [*Herman F. Nehlsen, Assistant Corporation Counsel,* of counsel], for the defendant.

HILL, P. J. Cross-appeals have been taken from a judgment entered in Broome county clerk's office on May 6, 1938, in favor of plaintiffs, who have also appealed from an order entered in the same clerk's office on August 1, 1938, which struck out each item of their costs and disbursements except those for referee's and stenographer's fees.

The plaintiffs, contractors and builders, in January, 1923, agreed in writing with the defendant in consideration of $320,085, to furnish the necessary labor and materials to construct " The Daniel S. Dickinson School." Work progressed until the 11th day of September, 1923, when " a large part of said building collapsed and fell in ruins." Immediately following this catastrophe there were negotiations and correspondence between the parties. The commissioner of public works of the city, by letter, directed plaintiffs to discontinue work on the building, " except such work as you may do by my request in cleaning away the debris and work of that character." It contained the following paragraph: " Your compliance with this letter will not be considered as an abandonment of the work on your part. Until the cause of the collapse of the building is definitely ascertained I do not think it is wise

or prudent to continue with the construction." Another communication from the same official stated, " I would request that you clear away the debris so as to make such inspection possible. You have an organization on the ground and are in a better position to do this than any other party interested." This letter directed that the work be done in a manner to give opportunity for inspection and study as to the cause of the collapse. The plaintiffs replied, " We will endeavor to clear away the debris in The Daniel S. Dickinson School building in such a manner as to make a more thorough inspection possible, it being understood, however, that this work by us will be done without any prejudice whatsoever to any rights or claims which we may have. And in the event that it is ultimately found that we are not to blame for the collapse, we shall, of course, expect to be compensated for every expense to which we have been or shall be put by reason thereof." Following this, a portion of the debris was cleared away. Numerous photographs were taken and full opportunity given for inspection. Certain items of the expenses were submitted by plaintiffs to the department of public works, approved by the commissioner and paid by a draft of the city treasurer.

On April 15, 1924, a second contract in connection with continuing the construction was made between the plaintiffs and the defendant. The original architects had employed a consultant who had devised changes. The portion of the contract concerning compensation and work to be done is as follows:

" 4. The party of the first part shall pay to the parties of the second part, as their entire compensation for such additional work and materials as are required in and by the said supplemental plans and for carrying the twelve inch wall indicated at D on said supplemental plans up through * * * to the underside of the roof, and for the premium on the additional bond required by the said party of the first part which was specified in the estimate bearing date March 17, 1924, which was furnished to the said party of the first part by the said parties of the second part, the sum of Twenty-eight thousand three hundred and fifteen dollars ($28,315.00), the times and amounts of such payments to be determined in all respects by, and pursuant to, the general provisions applicable to the payments to the ' Contractors ' contained in said contract of January 10, 1923."

The estimate of March 17, 1924, mentioned in the above-quoted section of the contract, was in form a letter to the board of contract and supply and is attached to the contract. In it is listed the work which was to be performed thereunder: " Walls #1, Floors of collapsed area #2, Piers at A #3, Main entrance walls, West walls at

D." For these five items the total was $26,795. In arriving at the amount named in the contract, $510 was added for the additional bond. The letter contained a further paragraph: " If the 12″ wall at D is carried up through the second and third stories to underside of roof, add to the above One thousand ten dollars ($1010)." On the day following the writing of the above letter, which was some weeks prior to the making of the contract, plaintiffs wrote to the bureau of contract and supply in part as follows:

" Below is a list of miscellaneous items not covered in the original plans and specifications nor covered by quotations of $26,795 for specific items recommended in Report of A. F. Gilbert, viz:

" Beam support for low ceilings of corridors in place of suspension rods which incumber duct spaces.

" Beams required over opening for air intake shaft in basement.

" Support for walls over wardrobes in class rooms.

" Columns necessary to support corner of corridor floorslab at stairs.

" Improvement of exterior wall bond and construction of brick walls which prevented a greater collapse (see previous quotation of $2,160 dated February 22, 1923).

" Expense due to collapse including removal of rubbish.

" The above items will probably not exceed a total of $13,600. This total does not cover any future changes in construction which was done under the original contract control. It is, however, a probable  maximum for the above items which are not included in the specific quotation of $26,795 presented to the Board of Contract and Supply on March 17, 1924."

The referee in his report states: " Upon the evidence before me, I find that the cause of the collapse was the insufficiency of the walls as designed to bear the load, together with the cutting of chases in the walls and piers by the contractor who was in privity with the City, but not with the plaintiffs." The city, after the collapse, obtained the services of a consulting architect and engineer. His reports are voluminous and largely given to detail, but I quote portions which are in the nature of conclusions supported by the detailed facts recited by him:

" Upon the failure of the pier in the basement the girder in question over the main entrance sagged to the south, dragging with it the floors and roof, causing the conditions as found.

" In addition to the foregoing conditions of faulty design of this structure the plans show the wall of the auditorium and the westerly wall of the second story corridor  *  *  *  designed to be supported on some form of steel cantilever construction, but in the structural steel plans and at the building this wall is shown as sup-

ported from the corridor floor. The structural steel drawings show concrete haunches under this wall, with reinforcing steel; in the remaining portion of the building this construction has been omitted, and it is assumed this condition also existed in the collapsed portion as there is no evidence of reinforcing bars as shown on plans as continuous.

"The added loading of this wall and the eccentric influence of this design assisted in the failure of the structure.

"In addition to the features as noted in the collapsed portion of this building as being of questionable and of faulty design, attention is called to exterior walls and piers."

Technical details are discussed in this paragraph. It concludes with the following characterization:

"Not good construction. Openings in interior walls are excessive in many cases, without proper use of reinforcements, bonding or the use of steel columns and girders.

"The plans fail to give figured dimensions in many cases, and this permits of indefinite results."

These quotations, together with the oral evidence, fully sustain the referee's finding of faulty design.

The plaintiffs are entitled to recover the reasonable value of loss through delay and removing the debris, and for extra items in the erection of the building as directed under the terms of the original contract, to which the supplemental contract of April fifteenth made reference. Plaintiffs asked $16,073.15, with interest from July 1, 1925, on account of damages sustained through delay, including interest on reserved percentage and delayed monthly estimates, and for unpaid items in connection with the removal of debris, and the further sum of $11,475, with interest from July 1, 1925, on account of extra and additional work and alterations in the construction of the building not called for by the plans but ordered by the defendant. Plaintiffs were allowed in the aggregate $9,233.51, with interest from July 1, 1925.

Payment for the services of Stento, $1,400, and Bassett, an engineer, $250, were asked by the plaintiffs; disallowed by the referee. The evidence that these men worked as claimed is not disputed. The city, by its letter earlier quoted, recognized that plaintiffs had "an organization on the ground," and obviously understood that it was needed and would be used. These items, amounting to $1,650, should be allowed.

Plaintiffs were required to pay an additional premium of $1,680.32 for the bond given in connection with the original contract because the collapse of the building delayed the completion nearly two years. I find nothing in the supplemental contract which requires plain-

tiffs to bear this expense incurred through fault of the city. The supplemental contract provides that in the making thereof " There is no waiver upon the part of any of the parties hereto of any right, defense, claim, remedy or any matter whatsoever."

Payment for work in cleaning rubbish and debris after April, 1925, to the extent of $1,000 is claimed. The city contracted, by the letters quoted in this opinion, with the plaintiffs to do this work. The evidence shows that plaintiffs did the work as required by the city to permit inspection and that it was not finished at the time the supplemental contract was made. The amount should be allowed.

Five items were disallowed by the referee; one for $1,330.73, " extra structural steel for roof of rooms on roof; " $245.77, " extra I-beams and rods to support four stair platforms; " $546.68, " extra I-beams and channels for low corridor ceilings; " $54.60, " extra lintel for fresh air shaft; " $550, " window mullions, increase size and weight." Changes were made by the city architects, or the new consultant, in the original plans and in those furnished with the supplemental contract, requiring the substitutions and changes as indicated by these five changes. In some instances, the original suggestions came from plaintiffs or their structural steel subcontractors, but in each instance the plans were prepared originally by an employee of the city or adopted after being prepared by the structural steel workers. Plaintiffs' evidence shows that the additional expense was incurred, and it is not controverted. These items, aggregating $2,747.78, should be allowed.

An item for $94.62 for " change two partitions in ground floor toilets and two door jambs at room No. 1." It is not disputed that this change was ordered by the architect. It should be allowed.

The plaintiffs claim $2,500 for furnishing 50,000 bricks in addition to those required by the contract. A Mr. Firth, reputed to be a man with wide building experience, was the representative of the new consultant and was present at the building much of the time after the new contract was made. He was sworn on behalf of the city and testified that he required the plaintiffs to substitute brick in numerous places and in great quantities where, under the original plans, tile construction had been used. The evidence on behalf of the plaintiffs as to the number of bricks used is not too definite, but will sustain a finding that 50,000 additional bricks were used. The claim of $2,500, therefore, should be allowed.

I am unable to find authority for allowing certain items of damage which plaintiffs suffered; loss of interest, payments to attorneys, and the like. The attorneys were employed in the event there was litigation. It is not an element of damage. Plaintiffs accepted

the delayed payments without requiring interest. I do not find authority for including it as a separate item.

The defendant on this appeal for the first time raises the question that the action may not be maintained because of the failure of plaintiffs to comply with section 64 of the Second Class Cities Law, by presenting a verified claim to the comptroller, and securing his audit thereof. This action was brought to recover for " work performed and materials furnished under contract with the Board of Contract and Supply." In the first paragraph of the January 10, 1923, contract it is stated descriptive of and concerning the defendant, " a municipal corporation organized under the laws of the State of New York and hereinafter referred to as ' The City ' acting by and through its Board of Contract and Supply," and the later contract of April, 1924, makes applicable the terms of the earlier one. The section does not apply to the claims for labor performed and material furnished under these contracts, and for which this action is brought.

Plaintiffs have appealed from an order made at the Chemung Special Term striking out, under section 1498 of the Civil Practice Act, costs and disbursements other than those stipulated. The giving or withholding of costs is governed by statute. Plaintiffs did not comply with the Civil Practice Act and are not entitled to costs. The section makes no mention of disbursements. The disbursements amounting to $2,502.25 allowed by the Special Term should be increased to $2,714.71, and as so modified the order should be affirmed.

Disbursements on this appeal should be allowed but no costs.

The judgment should be modified by adding to the amount fixed in the court below $9,673.12, with interest from July 1, 1925.

McNamee, Crapser, Bliss and Heffernan, JJ., concur.

Judgment modified on the law and facts by increasing the damages from $9,233.51 to $18,906.63, with interest thereon from July 1, 1925, with disbursements amounting to $2,714.71 as allowed, but with no costs.

The referee's report wherein findings are not numbered, is modified in the following particulars, and the court makes the following new findings of fact: Nos. 49, 52, 53, 54, 55, 56, 59, 64, items 6 and 8 of No. 68, all taken from plaintiffs' requests to find as printed in the record.

Order of the Chemung Special Term striking out all costs and certain disbursements modified by including additional disbursements as indicated in the opinion. Plaintiffs are awarded and permitted to recover from defendant their disbursements on these appeals, but no costs.